1  VAN ALLYN GOODWIN, Bar No. 095170
   vgoodwin@littler.com
2  CHRISTINA H. HAYES, Bar No. 267153
   chayes@littler.com
3  LITTLER MENDELSON, P.C.
   501 W. Broadway, Suite 900
4  San Diego, California  92101.3577
   Telephone: 619.232.0441
5  Facsimile:  619.232.4302

6  STEVEN G. BIDDLE, AZ Bar No. 012636
   *Admitted Pro Hac Vice*
7  sbiddle@littler.com
   LITTLER MENDELSON, P.C.
8  2425 East Camelback Road, Suite 900
   Phoenix, Arizona  85016
9  Telephone: 602.474.3613
   Facsimile:  602.926.8884

10
11 SCOTT A. WILSON, Bar No. 73187
   scott@pepperwilson.com
12 LAW OFFICES OF SCOTT A. WILSON
   433 G Street, Suite 203
13 San Diego, CA 92101
   Telephone: 619.234.9011
14 Facsimile:  619.234.5854

15 *(See next page for additional attorneys)*

16 Attorneys for Defendant
   SYCUAN BAND OF THE KUMEYAAY NATION

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITE HERE LOCAL 30, | Case No. 3:20-CV-01006-W-DEB |
| Plaintiff, | **DEFENDANT'S RULE 13 COUNTERCLAIM FOR DECLARATORY RELIEF** |
| v. | |
| SYCUAN BAND OF THE KUMEYAAY NATION; DOES 1-100, | (Honorable Thomas J. Whelan) |
| Defendants. | |

LITTLER MENDELSON, P.C.
501 W. Broadway
Suite 900
San Diego, CA 92101.3577
619.232.0441

Case No. 3:20-CV-01006-W-DEB

1. *(Additional Attorneys)*
2. MARK RADOFF, Bar No. 119311
3. mradoff@sycuan-nsn.gov
   General Counsel
4. SYCUAN TRIBAL GOVERNMENT LEGAL DEPARTMENT
   2 Kwaaypaay Court
5. El Cajon, CA, 92019
   Telephone: 619.445.4564
6. Facsimile:  619.445.0238

Attorneys for Defendant
SYCUAN BAND OF THE KUMEYAAY NATION

LITTLER MENDELSON, P.C.
501 W. Broadway
Suite 900
San Diego, CA 92101.3577
619.232.0441

2.   Case No. 3:20-CV-01006-W-DEB

Defendant Sycuan Band of the Kumeyaay Nation ("the Sycuan Band") hereby files this Counterclaim ("Counterclaim") against Unite Here Local 30 ("the Union"). In its Counterclaim, the Sycuan Band asks this Court to resolve the parties' dispute, exemplified by the Union's Complaint to Compel Arbitration ("the Petition"), concerning enforcement of a Tribal Labor Relations Ordinance ("TLRO") that the State of California forced the Sycuan Band to adopt initially in 1999.

In order to resolve this dispute, the Sycuan Band requests that this Court enter an order declaring that the National Labor Relations Act ("NLRA") preempts and invalidates enforcement of the TLRO, thus rendering the purported dispute between the parties non-arbitrable, and preserving the Sycuan Band's sovereign immunity from suit.

## JURISDICTION AND VENUE

1. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 as the Sycuan Band's claims listed below seek declaratory relief under 28 U.S.C. § 2201 arising out of an actual controversy between the parties as to the application of an applicable federal statute, the NLRA, 29 U.S.C. § 151 et. seq.

2. Venue lies within this judicial district pursuant to Section 301(a) of the Labor Management Relations Act, 29 U.S.C. §185(a), and 28 U.S.C. § 1391(b).

## FACTS SUPPORTING COUNTERCLAIM

### Background

3. The Sycuan Band is a federally recognized tribe of Mission Indians that has lived in and around the foothills of the Dehesa Valley near San Diego since time immemorial.

4. In 1875, President Ulysses S. Grant established the Sycuan Reservation by executive order, to be held in trust by the United States for the benefit of the Sycuan Band.

5. Today, the Sycuan Reservation lies within unincorporated San Diego County, within twenty miles of the city of San Diego.

6. The Sycuan Band is sovereign within the reservation's boundaries, retaining all powers of self-government not extinguished by the United States Congress, including sovereign immunity from suit and free from the laws or authority of the State of California.

7. The Sycuan Reservation is governed by the Sycuan General Council, including all adult tribal members, and the Sycuan Tribal Council, whom they elect into office every four years.

8. The Sycuan government serves the Sycuan Reservation by providing a broad variety of vital government services and programs (including public safety and fire protection; medical, dental and ambulance service;, educational scholarships; cultural, senior and nutritional programs; water and sanitation facilities and services; and housing development and rehabilitation) that benefit both the Sycuan Tribal community and the greater San Diego community at large.

9. Besides certain self-determination funding provided under self-governance contracts with the United States, the Sycuan Band substantially funds these crucial government services through revenue from its economic development projects.

10. The Sycuan Casino and Resort ("the Casino Resort") is the cornerstone of the Sycuan Band's economic development.

11. The Casino Resort began from humble origins in 1983 as the Bingo Palace, which the Sycuan Band developed to alleviate the severe economic depression, unemployment, substandard housing, and sanitation conditions and other deprivations of even the most basic governmental services that had long afflicted the Reservation community, which are necessary for the general welfare of its members.

12. The Casino Resort is today a premier gaming facility that provides jobs to Sycuan tribal members and non-members alike, and its purpose remains the same: to safeguard the well-being of the Sycuan Band's members and the reservation they occupy, and to raise revenue for essential services to further the Sycuan Band's tribal sovereignty.

LITTLER MENDELSON, P.C.
501 W. Broadway
Suite 900
San Diego, CA 92101.3577
619.232.0441

4.   Case No. 3:20-CV-01006-W-DEB

**State Encroachment into Tribal Gaming**

13. For years, the State of California sought to unlawfully regulate jurisdiction over the Bingo Palace, along with other tribal gaming facilities throughout the state. These encroachments culminated in the United States Supreme Court's landmark decision in *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987), wherein that Court affirmed that under extant federal law, the State of California had no civil-regulatory authority over gaming on Indian lands.

14. In response to the *Cabazon Band of Mission Indians* decision, the United States Congress passed the Indian Gaming Regulatory Act ("IGRA"), Pub.L. 100–497, 25 U.S.C. § 2701 et seq., in 1988, establishing the modern legal framework for tribal gaming.

15. IGRA affirms that "Indian tribes have the exclusive right to regulate gaming activity on Indian lands if the gaming activity is not specifically prohibited by Federal law and is conducted within a State which does not, as a matter of criminal law and public policy, prohibit such gaming activity." 25 U.S.C. § 2701(5).

16. IGRA allows tribes to operate Las Vegas-style high stakes games, defined as Class III games by that statute, only pursuant to a gaming compact signed between the relevant tribe and the surrounding state.

17. "The passage of IGRA did not end the fight over Indian gaming in California." *In re Indian Gaming Related Cases*, 331 F.3d 1094, 1098–105 (9th Cir. 2003). The State refused for many years to negotiate Class III gaming compacts with tribes within its borders.

18. Circumstances escalated when the San Diego County Sheriff's Office, with state coordination, repeatedly invaded the Sycuan Reservation throughout the 1990s, raiding its gaming facilities and forcing the Sycuan Band to seek and obtain injunctive relief from the United States District Court for the Southern District of California.

LITTLER MENDELSON, P.C.
501 W. Broadway
Suite 900
San Diego, CA 92101.3577
619.232.0441

5.   Case No. 3:20-CV-01006-W-DEB

19. Eventually, after years of complex political efforts, including a constitutional amendment, the Sycuan Band and other tribes successfully pressured the State of California into negotiating Class III gaming compacts.

**Negotiation and Execution of the Sycuan Compact**

20. While the State of California agreed to negotiate, it conditioned its agreement to Class III gaming on various concessions from the Sycuan Band and other gaming tribes.

21. In 1999, after the passage of Proposition 1A, a number of California tribes entered into identical gaming compacts that became known as the "1999 Compacts."

22. At the time the 1999 Compacts were entered, the issue of whether the National Labor Relations Board ("NLRB") could regulate the employment relationship between employees working in commercial gaming establishments on tribal lands, and whether the NLRA preempted a TLRO created under state law, was unsettled.

23. For relevant purposes here, the State of California required that the Sycuan Band and other gaming tribes agree to adopt and maintain identical TLROs to guarantee various labor rights to unions and tribal gaming employees, beyond those legally required of other businesses, and that were ordinarily controlled by the free play of economic forces.

24. After the 1999 Compacts went into effect, the D.C. Circuit in 2007 concluded that the NLRA applies to tribal governments and does not preclude application to the commercial activities of tribal governments. *See San Manuel Indian Bingo and Casino v. N.L.R.B.*, 475 F.3d 1306 (D.C. Cir. 2007).

25. Prior to the *San Manuel* decision, the NLRA exempted state and federal governments from the definition of employers, but its application was silent as to tribal employers.

26. In 2008, in *Chamber of Commerce v. Brown,* 554 U.S. 60 (2008), the United States Supreme Court ruled that where a state law regulates within a zone protected and reserved for market freedom, the state law is preempted by the NLRA.

27. In 2015, the Sixth Circuit held that the NLRA *could* or *may* be applied to the operation of a casino within a reservation on trust land. *See N.L.R.B. v. Little River Band of Ottawa Indians Tribal Gov't*, 788 F.3d 537 (6th Cir. 2015).

28. Then, in 2018, the Ninth Circuit extended the principle to hold that the NLRA does govern the relationship between a tribal casino and its employees. *See Casino Pauma v. N.L.R.B.,* 888 F.3d 1066 (9th Cir. 2018), *cert. denied, Casino Pauma v. N.L.R.B.*, 139 S. Ct. 2614, 204 L. Ed. 2d 264 (2019).

29. At the time of the original 1999 Compacts, it was unclear whether the NLRA reached tribal businesses, and thus might preempt tribal labor ordinances, and was still unsettled when the 2015 Compact extension occurred.

30. In the *Casino Pauma* case, the tribe argued that the TLRO preempted the NLRA, which was not adopted by the court. *See Casino Pauma,* 888 F.3d at 1080 ("We conclude that Casino Pauma's compact with California does not displace the application of the NLRA to its activities").

31. In the decades preceding *Casino Pauma*, the NLRB had disclaimed jurisdiction over tribes as employers and held the NLRA did not reach their labor relations, even though the NLRA was applied to interpret tribal labor relations ordinances. *See Casino Pauma*, 888 F.3d at 1074.

32. The California tribes agreed to negotiate the terms of such labor ordinances, but protested that labor relations were either ultra vires or an inappropriate subject for a compact under the IGRA and affirmed their reluctance to waive tribal sovereign immunity in labor matters.

33. At 8:00 pm on September 7, 1999, California gave the tribes its final offer, a boilerplate model compact for all interested tribes ("the Model Compact"), and demanded a response within two hours. When some tribes reached out in that short interval to address concerns, they found the state negotiation team inaccessible. Capital staff escorted tribal negotiators from the California Governor's reception room.

LITTLER MENDELSON, P.C.
501 W. Broadway
Suite 900
San Diego, CA 92101.3577
619.232.0441

7.   Case No. 3:20-CV-01006-W-DEB

34. Without alternatives, 57 tribes, including the Sycuan Band, signed letters of intent to enter the standardized Model Compact.

35. Section 10.7 of the Model Compact addressed the State's demand that tribes not only adopt tribal labor ordinances, but allow the State to commandeer tribal legislatures, forcing them to adopt:

> an agreement or other procedure acceptable to the State for addressing organizational and representational rights of Class III Gaming Employees and other employees associated with the Tribe's Class III gaming enterprise, such as food and beverage, housekeeping, cleaning, bell and door services, and laundry employees at the Gaming Facility or any related facility, the only significant purpose of which is to facilitate patronage at the Gaming Facility.

36. The Sycuan Band signed a version of the Compact on September 10, 1999, that mirrored the Model Compact in all substantive respects.

37. On September 14, 1999, the State of California finalized the labor relations "agreement or other procedure" it found acceptable under Section 10.7 of the Model Compact. The result was a standardized Tribal Labor Relations Ordinance ("TLRO") that tribes were forced to accept as an addendum to their Compact if they wished to conduct Class III gaming.

38. On September 17, 1999, the State of California sent the TLRO to the Sycuan Band and demanded the Sycuan Band adopt the State's proposal into tribal law as a condition to conduct Class III gaming.

39. Under such pressure, the Sycuan Band General Council adopted resolution No. 99-250 on October 2, 1999, adopting the TLRO.

40. The Sycuan Tribe and the State of California transmitted the Sycuan Compact, with the TLRO appended, to the Secretary of the United States Department of the Interior for his approval as required under the IGRA. The Interior Secretary received this Compact on March 23, 2000, and approved it on May 11 of that year.

41. On September 2, 2015, the Sycuan Band and the State of California executed an amendment to the Sycuan Compact ("the Amended Compact"). The

LITTLER MENDELSON, P.C.
501 W. Broadway
Suite 900
San Diego, CA 92101.3577
619.232.0441

8.

Case No. 3:20-CV-01006-W-DEB

Secretary of the Interior approved that amendment, and it remains the operative compact between the signatories.

42. Section 12.10 of the Amended Compact is substantively identical to Section 10.7 of the Model Compact. The TLRO, as attached to the Amended Compact at Appendix C, remains the version of the TLRO at issue here.

### The TLRO

43. The TLRO provides rights to employees and unions comparable to those guaranteed under the NLRA and largely tracks its language. It protected the right of eligible employees to unionize, negotiate collective bargaining agreements, strike, or refrain from these activities.

44. However, the TLRO contains additional provisions that far exceed those required for other businesses under the NLRA. For instance, Section 7(c)(1) of the TLRO, at issue in the Petition, purportedly requires the Sycuan Band to provide unions attempting to organize with an election eligibility list containing employees' names, addresses, telephone numbers and email addresses.

45. Similarly, Section 8(a) of the TLRO, at issue as well, purportedly requires the Sycuan Band to grant the Union access to certain non-work areas of the Casino Resort to organize certain employees referred to as "Eligible Employees."

46. The TLRO also exceeds the NLRA's protections in other respects, including permitting unions or employees to organize secondary boycotts after impasse, which the NLRA prohibits as an unfair labor practice. In addition, Section 7(c)(2) purports to require the Sycuan Band to "not act in any way which is or could reasonably be perceived to be anti-union." Conversely, the NLRA allows employers to engage in "free speech" which includes the right to oppose unions if they wish.

47. Section 13 of the TLRO provides for resolution of disputes between the relevant tribes and its employees or their union through arbitration by arbitrators from the Tribal Labor Panel.

LITTLER MENDELSON, P.C.
501 W. Broadway
Suite 900
San Diego, CA 92101.3577
619.232.0441

9.    Case No. 3:20-CV-01006-W-DEB

48. Also according to Section 13, a party can move to compel arbitration, or confirm or vacate an arbitration award, in the appropriate state superior court.

49. That Section also states that if the parties to arbitration had entered a binding bilateral contract under Section 7 of the TLRO, they could seek to compel arbitration, or confirm or vacate an arbitration award in federal court.

50. Under the TLRO, if a valid bilateral contract is formed, the Sycuan Band ostensibly "agree[d] to a limited waiver of its sovereign immunity for the sole purpose of compelling arbitration or confirming or vacating an arbitration award issued pursuant to the Ordinance in the appropriate state superior or federal court."

## Unite Here Local 30's Petition

51. In November 2019, the Union sent the Sycuan Band several letters indicating its intent to organize employees at the Casino Resort and demanding certain concessions (e.g., access to nonpublic areas of the Casino Resort to reach employees) to assist its effort.

52. The Union based its demands on the TLRO alone. The Sycuan Band has never entered into a contract with the Union, and there is a failure of consideration.

53. The Sycuan Band, through its General Counsel, refused the Union's requests for access, directing it instead to the Sycuan Gaming Commission, the designated tribal body to issue licenses required for entering nonpublic areas of the Casino Resort, under the process and procedures applicable to all third parties.

54. In response, on November 15, 2019, the Union wrote the Sycuan Band's General Counsel, alleging that the Sycuan Band had violated the TLRO by limiting its access.

55. That same day, November 15, 2019, the Union unilaterally contacted the American Arbitration Association, requesting a list of arbitrators who serve on the Tribal Labor Panel, in order to pursue its grievances against the Sycuan Band.

56. On December 3, 2019, the Sycuan Band's General Counsel sent an email to the American Arbitration Association, stating that:

LITTLER MENDELSON, P.C.
501 W. Broadway
Suite 900
San Diego, CA 92101.3577
619.232.0441

10.   Case No. 3:20-CV-01006-W-DEB

Sycuan will not be participating in the Tribal Labor Panel arbitration. It is our position that the TLRO has been preempted by the NLRA and for that reason the Tribe does not recognize the dispute resolution process contained therein, and cannot consent to commencing the process initiated by Unite HERE.

57. On or about December 12, 2019, the Sycuan Band's General Counsel sent the Union's counsel a letter in which he stated, "By this correspondence, I wish to confirm that the Tribe's legal position is that the TLRO is preempted by the National Labor Relations Act (NLRA) and is therefore null and void; and the Tribe has no obligation to comply with it."

58. On June 1, 2020, the Union filed the Complaint to Compel Arbitration in this lawsuit against the Sycuan Band and "100 unnamed Does" in the United States District Court for the Southern District of California.

## FIRST CLAIM FOR RELIEF
## DECLARATORY RELIEF UNDER 28 U.S.C. § 2201

59. The Sycuan Band incorporates by reference the allegations contained in paragraphs 1 through 58 as if fully set forth herein.

60. Under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201(a), "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is sought."

61. An actual, present, and justiciable controversy has arisen between the Sycuan Band and the Union concerning the validity and enforceability of the TLRO as applied to the Sycuan Casino Resort and its employees.

62. That dispute is demonstrated by the Union's Petition, the allegations and correspondence included in the Petition, and this Counterclaim.

63. In particular, the Sycuan Band disputes whether the TLRO remains valid and enforceable on its face, or whether, in contrast, it is preempted by the NLRA under

the doctrines of preemption established by the United States Supreme Court. *See Lodge 76, Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Wisconsin Employment Relations Comm'n*, 427 U.S. 132 (1976); *San Diego Bldg. Trades Council, Millmen's Union, Local 2020 v. Garmon*, 359 U.S. 236 (1959). *See also Casino Pauma*, 888 F.3d at 1074 (holding that Indian tribes are "employers" within the meaning of and subject to the restrictions of the NLRA).

64. To the extent that the Sycuan Band can maintain the TLRO, it can only do so with the application of the NLRA as the substantive and controlling law that preempts any inconsistent terms or those that interfere with the active enforcement of the NLRB's regulatory scheme.

65. Where the State's labor template is inconsistent with the NLRA, it is preempted under these doctrines. The standardized TLRO adopted as an exhibit to the Tribal-State Compact cannot supplant federal law.

66. Although the *Casino Pauma* court ruled that the NLRA applies to Indian tribes, no federal court within California has yet ruled whether the NLRA preempts and invalidates the TLRO that the State of California forced upon gaming tribes such as the Sycuan Band. Until this question is resolved through a declaratory judgment, the Sycuan Band and the Union will continue to dispute this issue without the benefit of judicial guidance, expending resources and placing tribal sovereignty repeatedly in jeopardy.

67. Accordingly, the Sycuan Band seeks a declaratory judgment from this Court that the NLRA preempts and invalidates the TLRO in its entirety.

68. Similarly, the Sycuan Band seeks a declaratory judgment from this Court that the Union's claims outlined in the Petition are not arbitrable because they rely for arbitrability on an unenforceable state requirement and tribal ordinance that must be interpreted by the incorporation or application of the NLRA.

69. The Sycuan Band further seeks a declaratory judgment from this Court that it is immune from suit on the Petition and has never waived its sovereign immunity in

any valid and enforceable instrument with respect to the Union, and that the Compact specifically precludes any third-party beneficiary claims or actions.

## PRAYER FOR RELIEF

WHEREFORE, the Sycuan Band respectfully requests that the Court:

    1.    Enter a judgment according to the declaratory relief sought in Paragraphs 60-69 above;

    2.    Award the Sycuan Band its attorneys' fees and costs in this action; and

    3.    Enter such other further relief that the Sycuan Band may be entitled as a matter of law or equity, or that the Court determines to be just and proper.

Dated: July 30, 2020.

LITTLER MENDELSON, P.C.

By: *s/ Steven G. Biddle*
VAN ALLYN GOODWIN
vgoodwin@littler.com
CHRISTINA H. HAYES
chayes@littler.com
STEVEN G. BIDDLE
sbiddle@littler.com

Attorneys for Defendant
SYCUAN BAND OF THE
KUMEYAAY NATION

LITTLER MENDELSON, P.C.
501 W. Broadway
Suite 900
San Diego, CA 92101.3577
619.232.0441

13.   Case No. 3:20-CV-01006-W-DEB

I hereby certify that I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants, and mailed a copy of same to the following if non-registrants, this 30th day of July, 2020, to:

KRISTIN L. MARTIN
klm@msh.law
KIMBERLY C. WEBER
kweber@msh.law
McCracken, Stemerman & Holsberry, LLP
595 Market Street, Suite 800
San Francisco, CA 94105
Attorneys for Plaintiff
UNITE HERE LOCAL 30

*s/ Tisha A. Davis*

4824-5067-3346.1 105805.1001

LITTLER MENDELSON, P.C.
501 W. Broadway
Suite 900
San Diego, CA 92101.3577
619.232.0441

14.

Case No. 3:20-CV-01006-W-DEB